UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MARVIN H. MAURRAS REVOCABLE TRUST and YONGQIAN ZHAO, derivatively on behalf of ACCRETIVE HEALTH, INC., | ) ) ) ) | 12 C 3395 12 C 6019 |
| Plaintiffs, | ) ) | Judge Feinerman |
| vs. | ) ) | |
| EDGAR M. BRONFMAN JR., J. MICHAEL CLINE, STEVEN N. KAPLAN, STANLEY N. LOGAN, DENIS J. NAYDEN, ARTHUR H. SPIEGEL III, and MARY A. TOLAN, MARK A. WOLFSON, | ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| ACCRETIVE HEALTH, INC., | ) ) | |
| Nominal Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER

In these consolidated shareholder derivative lawsuits, Marvin H. Maurras Revocable Trust ("Maurras Trust") and Yongqian Zhao claim on behalf of Nominal Defendant Accretive Health, Inc., that Accretive's directors—Edgar M. Bronfman, Jr., J. Michael Cline, Steven N. Kaplan, Stanley N. Logan, Denis J. Nayden, Arthur H. Spiegel III, Mary A. Tolan, and Mark A. Wolfson—violated fiduciary duties they owed Accretive under Delaware law and breached federal securities law. In particular, the 130-page, four-count consolidated verified shareholder derivative complaint alleges that Defendants: (1) breached their duties of loyalty and good faith by knowingly causing or permitting Accretive to violate various state and federal laws with the result that Accretive's stock value plummeted when the alleged violations came to light; (2)

breached their fiduciary duty to maintain internal controls regarding Accretive's compliance with federal and state healthcare, debt collection, and consumer protection laws; (3) made untrue statements or omissions of material fact in connection with the purchase or sale of Accretive stock, in violation of § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5; and (4) breached § 29(b) of the Securities Exchange Act, 15 U.S.C. § 78cc(b), by receiving incentive compensation and fees while violating § 10(b) and Rule 10b-5. Doc. 72. Unless otherwise noted, all docket references are to Case 12 C 3395.

Defendants have moved to dismiss the complaint for failure to adequately allege demand futility under Federal Rule of Civil Procedure 23.1(b)(3)(B) and, alternatively, for failure to state a claim upon which relief can be granted. Doc. 93. The complaint is dismissed for failure to adequately allege demand futility, but the dismissal is without prejudice and with leave to file an amended complaint.

## Background

In considering the motion to dismiss, the court assumes the truth of the complaint's factual allegations, though not its legal conclusions. *See Munson v. Gaetz*, 673 F.3d 630, 632 (7th Cir. 2012). Besides the complaint itself, the court must consider "documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice," along with additional facts set forth in Plaintiffs' brief opposing dismissal, so long as those facts "are consistent with the pleadings." *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012). The facts set forth below are stated as favorably to Plaintiffs as permitted by the complaint and the other materials just mentioned, with all reasonable inferences drawn in Plaintiffs' favor. *See Westmoreland Cnty. Emp. Ret. Sys. v. Parkinson*, __ F.3d __, 2013 WL 4266586, at *8 (7th Cir. Aug. 16, 2013) (in evaluating whether

plaintiffs in a derivative suit have adequately pleaded demand futility, "any inferences reasonably drawn from the factual allegations of the complaint must be viewed in the light most favorable to the plaintiffs") (quoting *In re Abbott Labs. Derivative S'holder Litig.*, 325 F.3d 795, 803 (7th Cir. 2003)).

The distinction between factual allegations that must be taken as true and conclusory assertions that must be ignored is crucial to the resolution of this motion. Plaintiffs repeatedly submit that their theory of demand futility rests not on the premise that Defendants were unaware of Accretive's ongoing (alleged) legal violations due to inadequate reporting mechanisms, but on the premise that Defendants "***knew*** about [Accretive's] violations of debt collection and health privacy laws, but decided to forego costly compliance and put short-term unlawful gain above the interest of [Accretive]." Doc. 108 at 35; *see also id*. at 32 ("the Court must apply the *Aronson* test [for demand futility] because Plaintiffs allege that a majority of Accretive's Board had actual knowledge of illegal wrongdoing, yet consciously decided not to take any steps to prevent or remedy the situation"); *id*. at 35 ("Plaintiffs do not allege mere lack of oversight, and no fair reading of the Complaint supports that conclusion"); *id*. at 36 ("Here, Plaintiffs provide particularized facts that the Individual Defendants ***knew*** about [Accretive's] unlawful debt collection practices and systematic violations of patient rights and yet failed to take any action to prevent or remedy the issues."); *id*. at 39 ("the Individual Defendants knowingly permitted Accretive to systematically violate numerous debt collection and patient privacy laws in its quest to maximize short-term profits at the expense of the long-term value of the Company"). As discussed in detail below, Plaintiffs have adequately alleged that Accretive broke the law. But given Plaintiffs' theory of demand utility, resolution of this motion turns on whether Plaintiffs have adequately alleged that the Defendants other than Tolan had sufficient knowledge of

Accretive's illegal actions and yet consciously refrained from taking steps to remedy the situation. Because this is a long opinion, and in an effort to most clearly set forth the court's rationale for concluding that demand futility has not been adequately alleged, the Background section will address certain pleading issues when recounting certain of the complaint's key allegations.

*Accretive's business and history*. Accretive is a Delaware corporation that is publicly traded on the New York Stock Exchange. Doc. 72 at ¶ 21. Accretive is a debt collector whose business is contracting with hospitals to collect payments from their patients and their insurers. *Id*. at ¶ 3. Accretive is distinguished from run-of-the-mill debt collectors by its use of private patient data to make predictions about individual patients that will guide its debt collection practices and by its integration of its debt collection services into the entire cycle of healthcare provision; in Accretive's words, it offers end-to-end "revenue cycle management services" to help hospitals "more efficiently manage their revenue cycles, which encompass patient registration, insurance and benefit verification, medical treatment documentation and coding, bill preparation, and collections." *Id*. at ¶ 31. Accretive's board of directors consists of the eight individual defendants and one director emeritus, who is not permitted to vote and who will not be mentioned again. *Id*. at ¶ 21. One defendant, Mary Tolan, is both a director and Accretive's CEO and President; the other seven defendants are outside directors, meaning that they are not Accretive officers. *Id*. at ¶¶ 22-29. Accretive also has an Audit Committee, which during the period of alleged wrongful conduct (November 2010 through November 2012) was composed of Logan, Kaplan, and Wolfson. *Id*. at ¶¶ 2, 265.

Accretive was formed in 2003 by two private equity and hedge fund firms, Accretive LLC ("Accretive LLC," to distinguish it from nominal defendant Accretive Health, Inc., which is

referred to as "Accretive") and Oak Hill Capital Management, LLC. *Id*. at ¶ 32. These two firms have controlled Accretive throughout its existence: they hired Tolan to be Accretive's founding CEO, each firm has two of its officers on Accretive's Board (Bronfman, Cline, Nayden, and Wolfson), and they continued to wield influence through their ownership of a substantial portion of Accretive's stock. *Ibid*. Accretive held an initial public offering in May 2010 and a second public offering in March 2011. *Id*. at ¶¶ 33, 36. Most of the defendants—Tolan, Cline, Bronfman, Nayden, Wolfson, and Spiegel—made millions of dollars each from sales of Accretive stock. *Id*. at ¶¶ 33-38.

> ***Defendants' debt collection history***. The complaint details the "tarnished history regarding debt collection practices" of one of Accretive's two founding firms, Accretive LLC. *Id*. at ¶¶ 39-44. In short, Accretive LLC got in trouble with the Minnesota Attorney General in 2009 after buying substantial ownership and control stakes in both a Minnesota-based arbitration company, which handled many consumer credit card collections arbitrations, and a major debt collection agency. *Id*. at ¶¶ 39-40. The Attorney General alleged that the arbitration company misled consumers and the public by holding itself out as a neutral forum despite its extensive cross-ties with Accretive LLC and its debt collection firm, which created a conflict of interest. *Id*. at ¶ 41. Soon thereafter, the arbitration company left the consumer arbitration business and the debt collector filed for bankruptcy. *Id*. at ¶ 42. Plaintiffs submit that Bronfman, Cline, Nayden, Wolfson, and Tolan were familiar with these transactions and with the Attorney General's objection to them, and therefore "were aware of the highly regulatory history in Minnesota regarding debt collection practices and of the Minnesota Attorney General's successful litigation against [the arbitration company] …. They knew that Lori Swanson, who was elected Attorney General in 2006 and re-elected for a four-year term in 2010, would not

tolerate fast and loose debt collection practices that misled consumers in her state." *Id*. at ¶ 44. This personal knowledge and experience could be relevant here because a central allegation in this lawsuit, discussed below, is that Defendants failed to monitor Accretive closely enough to prevent it from engaging in unlawful debt collection practices, or even that Defendants knew about those practices but did nothing to stop them.

*The Fairview contracts.* Fairview Health Services is a nonprofit that owned several hospitals in Minnesota at all relevant times and had fiscal year 2010 revenues of around $2.8 billion. *Id*. at ¶ 45. Accretive's business relationship with Fairview was formed through two contracts made in 2010. *Id*. at ¶ 46. The first was the "Revenue Cycle Operations Agreement" ("RCA") signed in March 2010. *Ibid*. Under the RCA, Fairview outsourced day-to-day revenue cycle operations (that is, billing and debt collection) to Accretive; Fairview executed a power of attorney to empower Accretive to make billing decisions on its behalf as related to Medicare, Medicaid, and third-party insurers. *Ibid*. In 2011, Accretive's revenue under the RCA was around $100 million, which was roughly 12% of Accretive's total revenue that year. *Ibid*. Accretive received both a base fee and incentive payments from Fairview for increasing the percentage of the money owed to Fairview by patients and their insurers that was actually paid. *Id*. at ¶ 48. The RCA empowered Accretive to control, reassign, and fire Fairview employees associated with the revenue cycle. *Id*. at ¶ 47. Accretive's RCA with Fairview was one of approximately fifty similar agreements Accretive had with other hospital groups in the United States. *Id*. at ¶ 52.

The second contract between Accretive and Fairview was the "Quality and Total Cost of Care" contract ("QTCC"). *Id*. at ¶ 53. Plaintiffs describe the QTCC as "Accretive's crown jewel and the template for its future business plan"; Fairview was the first (and so far the only) client to

sign a QTCC with Accretive, but Accretive hoped that the Fairview QTCC would serve as a model to be duplicated with other hospitals. *Id*. at ¶¶ 53, 56. The QTCC greatly increased Accretive's integration into Fairview's business by allowing Accretive to assist Fairview in negotiations with HMOs and insurers, to manage health risk assessments for patients, to automate care plans, to manage the pharmacy, and to decide the duration of hospital stays for Fairview patients. *Id*. at ¶ 53. The QTCC also allowed Accretive to rate and assess the financial performance of Fairview's doctors, to assign patients to various risk categories, and to pay incentives to the more "efficient" doctors based on their patients' risk scores. *Id*. at ¶ 54. Accretive projected that it would take in $60 million in revenue for every $1 billion in net revenues to Fairview, with the bulk of this income coming from incentive fees. *Id*. at ¶¶ 54-55.

The entire Accretive board (other than Logan, who was not yet a director) approved the QTCC on October 21, 2010, after being extensively briefed on its terms. *Id*. at ¶ 57. Due to the QTCC's central place in Accretive's business model, the board received regular updates on it. *Id*. at ¶ 60. For example, at the board meeting held on November 2, 2010, the board was presented with the QTCC's details and informed that it was expected to cut almost $500 million in healthcare costs for Fairview by 2015. *Ibid*. As Accretive's CEO, Tolan made several public statements promoting the value to Accretive of the QTCC, and in its Form 10-K filed with the SEC on February 29, 2012, Accretive claimed that it expected to earn $60 million in revenue from the QTCC each year. *Id*. at ¶¶ 61-62.

Key to the QTCC was a software system called "AccretiveQ." *Id*. at ¶ 59. AccretiveQ took as its inputs highly personal patient data, and its outputs were "risk scores" for use in managing care plans, pharmacy management, and hospital stay durations. *Ibid*. AccretiveQ's computer model identified "high priority" patients, those whom Accretive viewed as the sickest

5% of the population and expected to account for 50% of healthcare costs. *Ibid*. The model also generated "Willingness to Pay" scores for patients, which incorporated sensitive patient information such as race, religion, zip code, and medical history. *Ibid*.

   ***Accretive's allegedly unlawful debt collection practices***. To maximize Fairview's savings and, concomitantly, its own incentive revenues, Accretive sought to shift the focus at Fairview in a way that would increase savings and income at the expense of patient care. *Id*. at ¶ 63. For instance, Accretive made Fairview staff understand that if they did not collect money from patients who were seeking emergency room treatment, they would be fired. *Id*. at ¶ 64. "Accretive's money-collecting techniques included concerted efforts to collect from patients before they were admitted to the hospital, at their bedside, and even in the emergency room itself. Accretive and Fairview tracked and graded each Fairview employee based on the patient's estimated share of the bill they collected each week. … [A]n Accretive manager sent an email to several Fairview employees after one of them collected a past due balance from a patient, saying, 'I witnessed the entire event and it was like poetry.'" *Id*. at ¶ 67.

   Accretive prepared scripts for emergency room attendants to use with patients and their families that were intended to imply (falsely and unlawfully) that the patient would not be treated until the payment was made. *Id*. at ¶ 68. A Fairview risk management consultant suggested that Accretive's aggressive debt collection practices might be violating the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd *et seq*., also known as the "Patient Anti-Dumping Law," which requires hospitals to provide stabilizing treatments to patients with emergency conditions without regard to insurance coverage or ability to pay. *Id*. at ¶ 78. Ultimately, Fairview was found to have violated EMTALA and other federal patient-protection laws. *Id*. at ¶ 79.

Fairview personnel complained that Accretive's tracking of their collection rates was demeaning and harmful to staff morale while contributing little to collections, but Accretive Vice President of Business Development Peter VanRiper replied that "we'll continue with it as-is. Our experience is that collections performance just doesn't get to target performance without this level of rigor." *Id*. at ¶ 70. Plaintiffs' allegations continue along the lines of the foregoing. *Id*. at ¶¶ 71-78.

Accretive's debt collection behavior at Fairview's hospitals and elsewhere resulted in a large number of civil suits being filed against Accretive under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*., and similar Minnesota statutes. Doc. 72 at ¶¶ 80, 85-88. For example, Accretive was sued for leaving a message about a debt owed by one person on another person's answering machine, contrary to the FDCPA's prohibition on communication by a debt collector with persons other than the debtor. *Id*. at ¶ 85; *see* 15 U.S.C. § 1692c(b). Moreover, despite entering in March 2010 into the Fairview RCA, under which Accretive began to act as Fairview's debt collector, Accretive did not become licensed as a debt collection agency with the Minnesota Department of Commerce until January 2011. Doc. 72 at ¶ 83.

For purposes of this motion to dismiss, there is no dispute about the allegations just set forth; as it must at the pleadings stage, the court will take as true that Accretive engaged in that alleged conduct and that it thereby violated the FDCPA, the EMTALA, and Minnesota law. The more important issue is what level of awareness Defendants had of these unlawful activities.

Plaintiffs allege that the unlawful practices were in keeping with "the tone at the top set by at least five Board members … —Bronfman, Cline, Nayden and Wolfson—and the CEO Tolan, who were all more concerned with short-term gain than faithfully stewarding the long-term interests of" Accretive, *id*. at ¶ 63, and that "[u]pper management at Accretive, particularly

Defendant Tolan, knew of and approved of this strong arm approach," *id*. at ¶ 65. Plaintiffs do

not make any specific allegations to back up their conclusory statements about the "tone at the

top"; they do not say, for instance, that Tolan or any other defendant told Fairview employees

that they would be fired if they did not demand pre-treatment payments from emergency room

patients, or that they directed Accretive employees to tell Fairview employees those things.

Rather, Plaintiffs' specific allegations are of actions by Tolan's inferiors, including VanRiper,

Ken Stoll (Vice President of Client Services), Tim Barry (President of Quality), an employee

named Brandon Weber, and an employee named Andrew Crook to whom Plaintiffs' counsel

immaturely and unprofessionally refer as "Andrew 'I Am Not A' Crook." *Id*. at ¶¶ 63-64, 66.

Plaintiffs allege that "Barry directly reported to Defendant Tolan and Crook, in turn, directly

reported to Barry," *id*. at ¶ 65, but absent any factual allegation suggesting that Tolan knew of or

encouraged the illegal practices, one cannot reasonably infer that Barry and Crook would have

told Tolan that they were encouraging unlawful behavior. There is no general rule that corporate

officials are presumed to know everything their subordinates know or that they are presumed to

be complicit in their underlings' law-breaking. To the contrary, "Delaware courts routinely

reject the conclusory allegation that because illegal behavior occurred, internal controls must

have been deficient, and the board must have known so." *Desimone v. Barrows*, 924 A.2d 908,

940 (Del. Ch. 2007). The principle applies even to members of an audit committee or other

subsection of the board. *See South v. Baker*, 62 A.3d 1, 17 (Del. Ch. 2012) ("As numerous

Delaware decisions make clear, an allegation that the underlying cause of a corporate trauma

falls within the delegated authority of a board committee does not support an inference that the

directors on that committee knew of and consciously disregarded the problem for purposes of

Rule 23.1.") (citing cases).

Plaintiffs also allege that "Accretive's Board knew about, and indeed approved the QTCC contract in October 2010, and yet still failed to ensure that the Company met the very minimal requirement of licensure" to act as a debt collector in Minnesota. *Id*. at ¶ 83. However, Plaintiffs do not allege that the directors were aware that Accretive was operating without a license, and nor do they allege that the "very minimal" task of compliance with applicable licensing regimes is the sort of thing that did rise or should have risen to the board level. Drawing such an inference in Plaintiffs' favor would not be reasonable, as a corporate board is permitted to assume that direction or oversight from the board is not needed to ensure that the firm's employees take care of such mundane tasks. *See In re Pfizer, Inc. Derivative Sec. Litig.*, 307 F. App'x 590, 593 (2d Cir. 2009) (refusing to infer that the Pfizer board had knowledge of "the existence of [a scientific study] that may have found cardiovascular risks related to [a Pfizer drug] … simply because it existed and was related to Pfizer's 'core' business"); *In re ITT Corp. Derivative Litig.*, 653 F. Supp. 2d 453, 461-62 (S.D.N.Y. 2009) (rejecting the plaintiffs' submission that the board of a defense manufacturing company was aware of the company's failure to obtain temporary export licenses for its night vision goggles, a matter for which outside counsel had been retained, where the complaint did not allege that the issue was brought to the board's attention); *Ferre v. McGrath*, 2007 WL 1180650, at *6 (S.D.N.Y. Feb. 16, 2007) ("Allegations of knowledge explained solely by the directors' service as directors, without more, are insufficient as a matter of law—even where, as here, the plaintiff alleges that the matters in suit relate to the corporation's 'core' business."); *see also In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 968 (Del. Ch. 1996) ("Most of the decisions that a corporation, acting through its human agents, makes are, of course, not the subject of director attention. Legally, the board itself will be required only to authorize the most significant corporate acts or transactions:

mergers, changes in capital structure, fundamental changes in business, appointment and compensation of the CEO, etc.").

Plaintiffs allege that several of the FDCPA lawsuits described in the complaint were settled and that Defendants, or at least some of them, presumably were aware of the settlements. Doc. 72 at ¶ 88. The argument is that the lawsuits (or the underlying violations) constituted "compliance incident[s] at a B level or higher," that Accretive's Director of Internal Audit was supposed to bring such incidents to the Audit Committee's attention and presumably did so, that some Defendants sat on the Audit Committee, and that the Audit Committee would have to disclose the risk created by the lawsuits to the entire board. *Ibid*. The court takes all this as true for purposes of this motion: Defendants knew Accretive was being sued for FDCPA violations, and could have concluded that there might have been some merit to the accusations. But all that means is that Defendants knew about possible prior violations and were on notice of the possibility of present or future violations; that does not make it reasonable to infer that Defendants had actual knowledge of ongoing violations, much less that they encouraged or condoned such violations. *See In re SAIC Inc. Derivative Litig.*, __ F. Supp. 2d __, 2013 WL 2466796, at *18 (S.D.N.Y. June 10, 2013) (noting that "magnitude and duration [of a company's alleged wrongdoing] may be *probative* of whether the Board knew or should have known about a violation of the law, though these factors will rarely suffice in their own right to satisfy Rule 23.1's requirement … that plaintiffs allege with particularity actual or constructive board knowledge," and refusing to infer that the board had knowledge of the ongoing wrongdoing solely based on the fact that one project's costs "ballooned from $63 million in 2001 to $700 million by 2010") (citation and internal quotation marks omitted); *In re Intel Corp. Derivative Litig.*, 621 F. Supp. 2d 165, 174 (D. Del. 2009) (holding that even where there is evidence that

the directors knew of "the ongoing investigations into Intel's alleged anti-competitive business practices," that alone is "insufficient for the Court to draw the significant inference that the Directors had constructive knowledge that an alleged failure to respond to the 'red flags' would be a breach of their fiduciary duties," given that "Plaintiff fails to identify what the Directors actually knew about the 'red flags' and how they responded to them"); *see also Jacobs v. Yang*, 2004 WL 1728521, at *6 n.31 (Del. Ch. Aug. 2, 2004) (holding that demand futility was not adequately pleaded where the plaintiff asserted that "the current board had knowledge of [the challenged transactions, which began several years earlier] and failed to recover on behalf of [the company] for any wrongdoing").

Given this, the complaint does not adequately allege that Defendants were or should have been aware that Accretive was committing FDCPA violations of such magnitude as to threaten the company's relationship with Fairview or its ability to do business in Minnesota. The distinction between actual knowledge of the alleged violations (or intent that the violations occur), on the one hand, and the mere failure to monitor for possible violations, on the other, is significant because Plaintiffs' theory of demand futility is premised in substantial part on the allegation that "a majority of Accretive's Board had *actual knowledge* of illegal wrongdoing, yet consciously decided not to take any steps to prevent or remedy the situation," and not that the board was unaware of illegal wrongdoing due to its failure to institute proper monitoring mechanisms. Doc. 108 at 32 (emphasis added). Thus, the inquiry turns on the extent of Defendants' actual knowledge of ongoing violations. As discussed below, Plaintiffs have not adequately pleaded that Defendants other than Tolan possessed the requisite knowledge.

The complaint also addresses a court-ordered agreement between Fairview and the Minnesota Attorney General that existed throughout Accretive's relationship with Fairview and

that placed further restrictions on Fairview's (and, by extension, Accretive's) debt collection practices. Doc. 72 at ¶¶ 93-121. These allegations do not add much to those just discussed, so a brief summary suffices. Fairview became concerned that some of Accretive's debt collection policies were putting Fairview in violation of its agreement with the Minnesota Attorney General. *Id*. at ¶ 99. After numerous complaints from Fairview, and responses from Accretive that Fairview found inadequate to address its concerns, Fairview decided to "transition its debt collection business away from Accretive effective January 31, 2012." *Id*. at ¶ 119. Shortly thereafter, Fairview terminated all relations with Accretive. *Id*. at ¶ 120.

Again, the key question for purposes of this motion is not whether Accretive was causing Fairview to violate its agreement with the Minnesota Attorney General—Plaintiffs have adequately alleged that it was—but how much Defendants knew about the gravity of the situation. Plaintiffs allege that when Fairview employees began to be concerned that Accretive was making them violate the agreement, "[t]he alarm escalated through Fairview's organization, reaching its Board of Directors, and escalated through Accretive's organization, coming on numerous times directly to the attention of Defendant CEO Mary Tolan. *It is reasonable to infer* that Defendant Tolan briefed the entire Board, the Audit Committee and certainly the four private equity directors [Cline, Bronfman, Nayden, and Wolfson] about the frustrations that the Fairview Board was expressing to her about Accretive's glaring violations of the law. Nevertheless, the minutes of the Audit Committee and of the Board of Directors show that the Board took absolutely no action to remedy the egregious violations of federal and Minnesota law by Accretive executives and employees." *Id*. at ¶ 99 (emphasis added).

Plaintiffs have adequately alleged that Tolan had actual knowledge of Fairview's complaints and that Accretive had violated the law. But contrary to Plaintiffs' assertion, it is not

reasonable to infer from those facts that Tolan would have explained this situation to the board, and in particular it is not reasonable to infer that she would have told the board that Accretive was engaged in "glaring violations of the law." That the board and Audit Committee minutes show that Defendants took no action on the issue does not plausibly suggest that Defendants were briefed on the Accretive-Fairview strife and its underlying causes but decided to take no action. *See Wood v. Baum*, 953 A.2d 136, 142 (Del. 2008) ("Delaware law on this point is clear: board approval of a transaction, even one that later proves to be improper, without more, is an insufficient basis to infer culpable knowledge … on the part of individual directors."); *In re Bidz.com, Inc. Derivative Litig.*, 773 F. Supp. 2d 844, 856 (C.D. Cal. 2011) (holding that the allegation that "each individual director had knowledge of the existence of shill bidding at Bidz, yet failed to take any action to curb the shill bidding," did not sufficiently allege demand futility because the plaintiffs "failed to allege particularized facts demonstrating that the [directors] actually knew about the alleged shill bidding, failed to act in light of such knowledge, and did so knowing their conduct breached their fiduciary duties to the company or otherwise broke the law") (internal quotation marks omitted) (citing *Stone v. Ritter*, 911 A.2d 362, 369-70 (Del. 2006)). More generally, it is not reasonable to infer that whenever a company has violated a law and the CEO is aware of that violation, the CEO will inform the board—particularly where, as here, the violations are alleged to have been pursuant to the CEO's plan to put short-term profits before principles. Doc. 72 at ¶ 63; *see In re Johnson & Johnson Derivative Litig.*, 865 F. Supp. 2d 545, 571-72 (D.N.J. 2011) (refusing to infer that the board had knowledge of an ongoing violation, even where the CEO "had knowledge of, and responsibility for, and approved and ultimately as CEO directed the use of the Company's … kickback strategy" and had received warning letters from the FDA, reasoning that "[w]ithout allegations that [the CEO] shared his

knowledge with the Board, the Court cannot conclude that the Board was ever aware of the FDA

letters").

Plaintiffs also allege that Tolan and other Accretive executives put together a "Fairview-

Accretive Partnership Discussion," which set forth "Ideas to Address Issues with AG and Overall

Relationship."  Doc. 72 at ¶¶ 107-109.  Among those "ideas" was "Board oversight on

relationship," and Plaintiffs allege that the referenced board is Accretive's, not Fairview's.  *Id*. at

¶ 109.  But the fact that Accretive's executives suggested more board oversight as a way of

addressing Fairview's concerns with Accretive's practices does not support a reasonable

inference that the board (other than Tolan) was aware of the alleged Accretive misconduct giving

rise to those concerns; to the contrary, the fact that the executives suggested more oversight

reflects the executives' view that the board was not aware of the specifics of the Fairview-

Accretive strife at the time the "Partnership Discussion" was formulated.  Moreover, there is no

allegation that the "board oversight" plan was ever implemented.

Plaintiffs make another attempt to establish actual knowledge in ¶ 92 of their complaint:

> All of the above [that is, the allegations about various unlawful debt collection
> activities, including violations of the court-ordered agreement between
> Fairview and the Minnesota Attorney General that imposed further
> restrictions, Doc. 72 at ¶ 90] was clearly known by the Individual Defendants.
> The Company's 2010 10-K and the 2011 10-K both stated that "our new
> business opportunities have historically been generated through high-level
> industry contacts of members of our senior management team ***and boards of
> directors*** and positive references from existing customers."  The Board also
> knew, as stated in both 2010 and 2011 10-Ks, that "in rendering our services,
> we must comply with customer policies and procedures regarding charity
> care, personnel, compliance and risk management as well as applicable
> federal, state and local laws and regulations."  Despite their own description
> of their duties and responsibilities, and despite the Board's familiarity with the
> RCA and the QTCC contracts, whose execution required that Accretive
> adhere to Fairview's obligations under its agreement with the Minnesota AG,
> the Board failed to even oversee that the Company was appropriately
> registered as a debt collector in the state of Minnesota.  Moreover, the Board
> knew that under both the RCA, and especially the QTCC contract, Accretive

> would be intimately involved with the operations of the ten Fairview
> hospitals.  Nevertheless, the Board minutes reveal that neither the Board nor
> the Audit Committee took any steps to ensure that Accretive's debt collection
> practices complied with the Fairview-Minnesota Attorney General
> Agreement.

Doc. 72 at ¶ 92.  These factual allegations support Plaintiffs' contentions that "the Board failed

to even oversee that the Company was appropriately registered as a debt collector" and that

"neither the Board nor the Audit Committee took any steps to ensure that Accretive's debt

collection practices complied with the" agreement between Fairview and the Minnesota Attorney

General.  However, nothing in this passage or the complaint as a whole raises the reasonable

inference that Defendants actually *knew* of Accretive's unlawful practices, as opposed to being

simply ignorant of those practices.  True, nothing in the complaint is necessarily *inconsistent*

with Defendants' having knowledge of Accretive's unlawful activities, but mere consistency

does not suffice; Plaintiffs must make factual allegations that give rise to a reasonable inference

of knowledge, and they have failed to do so.  *See McReynolds v. Merrill Lynch & Co., Inc.*, 694

F.3d 873, 885 (7th Cir. 2012) ("Where a complaint pleads facts that are 'merely consistent with'

a defendant's liability, it 'stops short of the line between possibility and plausibility of

entitlement to relief.'") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 557 (2007)); *In re*

*Capital One Derivative S'holder Litig.*, __ F. Supp. 2d __, 2013 WL 3242685, at *17 (E.D. Va.

June 21, 2013) ("It is not enough for plaintiffs to plead that the directors as a whole became

aware of the red flags because they were disclosed in the financial statements.  Plaintiffs must

plead with particularity that each individual director was aware of the red flags."); *In re Forest*

*Labs., Inc. Derivative Litig.*, 450 F. Supp. 2d 379, 387 (S.D.N.Y. 2006) ("Because Rule 23.1

requires particularized allegations, the pleading standard is higher than the standard applicable to

a pleading subject to a motion to dismiss pursuant to Rule 12(b)(6).").

Finally, Plaintiffs allege:

> All five Defendants affiliated with Accretive LLC (Defendants Cline, Bronfman, Nayden, Wolfson and Tolan) knew about the importance to the Minnesota Attorney General of debt collection practices from their prior experience of the Attorney General's lawsuit that effectively dismantled the Forum. They also knew of the critical importance of the Fairview contracts to the Company's revenue. … Despite this knowledge and in breach of their fiduciary duties of loyalty to the Company, these five directors neglected to see that Accretive took any meaningful steps at all to comply with Minnesota law in its implementation of the Fairview contracts.

Doc. 72 at ¶ 121. This allegation does not suggest that Defendants were actually aware of Accretive's violations, but merely that they should have taken steps that would have made them aware, through better monitoring and compliance systems, and yet failed to do so. In other words, it is precisely the kind of allegation that Plaintiffs *disclaim* making in support of their position on demand futility. Doc. 108 at 35 ("Plaintiffs are not asserting that the Board rendered itself blissfully unaware of Accretive's ongoing violations by having inadequate reporting mechanisms"); *id*. at 32, 36, 39.

*Accretive's alleged violations of patient privacy laws***.** As mentioned above, Accretive possessed a great deal of highly sensitive personal medical and financial information about patients at the hospitals it contracted with. Doc. 72 at ¶ 122. That sort of data is subject to privacy protection laws that regulate the steps that firms possessing the data must take to prevent it from being obtained by persons not authorized to see or use it; among these laws are the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), 42 U.S.C. § 1320d *et seq*., and the Health Information Technology for Economic and Clinical Health Act ("HITECH Act"), 42 U.S.C. § 17921 *et seq*., along with regulations promulgated thereunder. Plaintiffs allege that Accretive violated these statutes or their appurtenant regulations by failing to implement the policies and procedures they require. Doc. 72 at ¶ 122.

Plaintiffs focus on one incident in particular. Accretive's employees worked mainly on laptops, with the result that private patient data was on the laptops' hard drives. *Id*. at ¶ 124. In February 2011, Accretive acknowledged that four such laptops had been stolen out of employees' cars, that in each case the employee had irresponsibly left the laptop in his or her car in plain view, and that the laptops often contain "tons of patient health and financial information." *Ibid*. Accretive further acknowledged that such thefts raise the specter of "HIPAA fines and penalties up to $1.5m per incident & significant loss of reputation." *Ibid*. Yet whatever steps Accretive took to prevent further thefts were insufficient, as five additional laptops were stolen during 2011. *Id*. at ¶ 125. Worse, Accretive employees had failed to encrypt the data on thirty laptops in 2011, meaning that any data on those laptops would be especially susceptible to disclosure were they to fall into the wrong hands. *Ibid*.

In July 2011, the laptop of an Accretive employee named Matthew Doyle was stolen from his unattended rental car. *Id*. at ¶ 127. The laptop was unencrypted and contained vast quantities of private data on some 23,000 patients. *Ibid*. This was contrary to the HIPAA and the HITECH Act, which provide that employees should have access only to the data set necessary to the performance of their duties. *Id*. at ¶ 130. After the theft became public, Fairview began hearing complaints from patients about the invasion of their privacy. *Id*. at ¶ 128. Accretive's response was just to tell its staff to do a better job of hiding their laptops when they leave them in their cars. *Id*. at ¶ 129.

Again, the important question at this stage of the litigation is how much Defendants knew about Accretive's violations. Logan, Wolfson, Kaplan, and Tolan were informed of the theft of Doyle's laptop at Audit Committee meetings in September and November 2011. *Id*. at ¶¶ 133-134. The Audit Committee did not discuss remedial measures at the September meeting, but at

the November meeting it decided to "develop procedures and communications protocol to ensure that employees periodically remove client data from laptops," recognizing that Accretive's "policies require our employees to access only the minimum amount of [personal patient data] needed to perform their duties." *Id*. at ¶¶ 135, 137.  Even then, the committee did not discuss encryption. *Id*. at ¶ 137.  It is reasonable to infer that members of the Audit Committee were aware that the Doyle theft was not the only laptop theft Accretive had experienced. *Id*. at ¶ 138.

Another source of patient privacy trouble was Accretive's operations in India, where Accretive had outsourced much of its business and where the majority of its employees were located. *Id*. at ¶ 139.  Wolfson, Kaplan, and Tolan learned about the privacy risks posed by the India operations at an Audit Committee meeting in February 2010. *Id*. at ¶ 142.  In particular, they were told that an "internal risk assessment survey" had concluded that "HIPAA/data privacy" was a "high risk" area for Accretive, a risk that included "information being transferred to India." *Ibid*.  They also were informed that there were not "enough resources in this area [data privacy] to provide all of the in-depth healthcare expertise/regulatory knowledge for individuals unfamiliar with the industry," though it is not clear from the complaint whether this warning was with reference to India or to Accretive's operations in general. *Ibid*.  The Audit Committee was given more warnings about potential weaknesses in Accretive's data privacy policies at meetings held in February 2011 and February 2012. *Id*. at ¶ 143.  Plaintiffs allege that there was "no indication that any action whatsoever had been taken in the intervening months." *Ibid*.  Plaintiffs do not point to any actual legal violations associated with Accretive's India operations—they refer in passing to a "password sharing incident in India," *id*. at ¶ 141, but the reference is so ambiguous as to be meaningless—and nor do Plaintiffs say that anyone ever brought a legal action against Accretive arising out of those operations.  Their allegation, rather, is that the Audit

Committee's apparent lack of concern about warnings regarding the India operations supports the inference that Defendants were not taking the necessary steps to implement internal policies to monitor and prevent data privacy violations, despite knowing that such violations could have a substantial negative impact on Accretive's business. *Id*. at ¶ 146.

***Accretive's alleged violations of anti-discrimination laws.*** Plaintiffs allege that Accretive violated anti-discrimination laws by calculating and applying "Willingness to Pay" ("WTP") scores for Fairview patients. *Id*. at ¶¶ 147-153. The model used by Accretive to calculate the scores sought to estimate for each patient how much of that patient's bill the patient was likely to pay. *Id*. at ¶ 147. Accretive would then use that score to choose the method by which it would attempt to collect from the patient. *Id*. at ¶ 148. For instance, where the model suggested that a patient had a high willingness to pay, Accretive would offer her a lower discount than it otherwise would, while patients with medium WTP would be "accelerated through the process and move to legal sooner than accounts in other segments." *Ibid*.

The data mining model used by Accretive to generate WTP scores relied on 142 data points about each patient, including zip code, gender, marital status, religion, insurance type, average household income (the average in the patient's zip code, presumably), average dependents in the patient's zip code, and so forth. *Id*. at ¶ 149. Plaintiffs point out that the Equal Credit Opportunity Act, 15 U.S.C. § 1691(a)(1), prohibits creditors from discriminating "on the basis of … religion … or marital status." Doc. 72 at ¶ 151. Plaintiffs also assert that Accretive's "use of religion, sex and marital status in calculating its WTP" violated the Minnesota Human Rights Act. *Id*. at ¶¶ 152-153. Plaintiffs do not suggest that Defendants had actual knowledge that Accretive's computer model relied in part on prohibited factors, and nor do they suggest that Accretive was ever subjected to legal action for these alleged violations.

*Accretive's public statements*. Plaintiffs recount many public statements made by Accretive to support their claims that Defendants violated federal securities law. *Id*. at ¶¶ 154-236. The bulk of these statements were press releases, particularly press releases announcing quarterly financial results; Forms 10-Q and 10-K filed with the SEC; and conference calls associated with each press release during which Tolan discussed Accretive's financial results and business plans. Plaintiffs attribute the press releases to Defendants and the conference calls to Tolan alone. *E.g.*, *id*. at ¶¶ 156, 160. The gist of Plaintiffs' complaint about those statements is that Accretive said things that would give the public the impression that Accretive had a bright future, and that Accretive did not say that it was simultaneously threatening that future by failing to take steps to prevent FDCPA, patient privacy, and other violations that might jeopardize its relationship with Fairview and the substantial profits provided by that relationship. *Id*. at ¶¶ 154-155. Representative is ¶ 157, which deals with the press release issued by Accretive to announce the signing of the QTCC contract with Fairview. After referring to various actions by Accretive (those discussed in detail above) that threatened its relationship with Fairview, Plaintiffs allege that "[a]s a result of the foregoing, the Individual Defendants lacked a reasonable basis for their positive statements regarding the Company's working relationship with Fairview and the Company's financial condition and future business prospects." *Id*. at ¶ 157(e).

*The Minnesota Attorney General's enforcement action*. In February 2012, Accretive signed a consent order with the Minnesota Department of Commerce. *Id*. at ¶ 237. As part of the consent order, Accretive agreed to cease debt collection activities in Minnesota. *Ibid*.

On March 29, 2012, Accretive made public the fact that it would no longer be collecting debts on behalf of Fairview. *Id*. at ¶ 239. That same day, Accretive's stock price fell nearly 19%. *Id*. at ¶ 240. In April, the Minnesota Attorney General released a report describing alleged

violations by Accretive of federal and state health, debt, and consumer laws. *Id*. at ¶ 241. The *New York Times* subsequently ran an article titled "Debt Collector Is Faulted for Tough Tactics in Hospitals," which referred to the Minnesota Attorney General's allegations and quoted a Fairview employee as saying that "[p]atients are harassed mercilessly" by Accretive's debt collectors. *Id*. at ¶ 242. The report and article caused a further 41% fall in Accretive's stock price. *Id*. at ¶ 243. As of November 2012, the stock price was $10.97 per share, down from $20-$27 per share, the range at which it had been trading prior to the negative publicity beginning in March 2012. *Ibid*.

In May 2012, Accretive was subjected to congressional investigations, including a hearing at which Accretive Senior Vice President Greg Kazarian apologized on behalf of the company for its improper debt collection practices. *Id*. at ¶ 245. In July 2012, the Minnesota Attorney General filed a "second amended and supplemental complaint" against Accretive. *Id*. at ¶ 246. On July 30, 2012, Accretive entered into a settlement agreement with the Minnesota Attorney General pursuant to which it paid $2.5 million in fines, agreed to wind down all of its Minnesota business operations, and agreed not to conduct business in Minnesota or on behalf of a Minnesota client for up to six years. *Id*. at ¶ 247.

***The present lawsuit.*** This consolidated lawsuit was initially filed as two separate suits by Maurras Trust and Zhao. Doc. 1 (12 C 3395); Doc. 1 (12 C 6019). The cases were consolidated under Case 12 C 3395, Doc. 68 (12 C 3395), after which Plaintiffs filed a Consolidated Verified Shareholder Derivative Complaint, Doc. 72. Neither Plaintiff made a demand on Accretive's board; rather, as discussed below, they allege that demand was futile and should therefore be excused because there is reasonable doubt as to whether at least half of Accretive's eight directors are disinterested and independent and, in the alternative, because there is reasonable

doubt as to whether Defendants are entitled to business judgment rule protection since they knowingly caused Accretive to break the law.  *Id*. at ¶¶ 276-299.

Two other related derivative suits filed against Defendants in Illinois state court were removed to this court, Nos. 12 C 6781 and 12 C 6798, but the court remanded those suits upon concluding that it lacked subject matter jurisdiction.  *See Haith ex rel. Accretive Health, Inc. v. Bronfman*, __ F. Supp. 2d __, 2013 WL 788214 (N.D. Ill. Mar. 1, 2013).  Those suits did not present any federal claims, and the parties in those suits were not completely diverse.  *Id*. at *1.

As for this case, subject matter jurisdiction is secure.  The court has jurisdiction over the federal securities claims under 28 U.S.C. § 1331 and supplemental jurisdiction over the Delaware law claims under 28 U.S.C. § 1367(a).  Even putting aside the federal claims, the court has diversity jurisdiction under 28 U.S.C. § 1332(a).  The parties are completely diverse. Plaintiff Maurras Trust is a citizen of Arkansas because its trustee, Marvin H. Maurras, is a citizen of that State.  Doc. 72 at ¶ 19; *see Grede v. Bank of New York Mellon*, 598 F.3d 899, 901 (7th Cir. 2010) ("a trust's citizenship is that of the trustee, rather than the beneficiaries, for the purpose of 28 U.S.C. § 1332(a)").  Plaintiff Zhao is a citizen of Massachusetts.  Doc. 72 at ¶ 20. Defendants Tolan, Cline, Kaplan, and Logan are citizens of Illinois; Defendants Bronfman and Spiegel are citizens of New York; Defendant Nayden is a citizen of Rhode Island; and Defendant Wolfson is a citizen of California.  *Id*. at ¶¶ 22-29.  Finally, nominal defendant Accretive is a citizen of Delaware, its state of incorporation, and Illinois, its principal place of business.  *Id*. at ¶ 21; *see* 28 U.S.C. § 1332(c)(1); *Weinstein v. Schwartz*, 422 F.3d 476, 478 (7th Cir. 2005) (for diversity jurisdiction purposes, "a corporation is aligned as a defendant in a shareholder's derivative suit").  The amount in controversy exceeds § 1332(a)'s $75,000 threshold.  Doc. 72 at ¶ 16.

**Discussion**

As noted above, Plaintiffs claim that Defendants (1) breached their duties of loyalty and good faith by knowingly causing or permitting Accretive to violate various state and federal laws with the result that Accretive's stock value plummeted when the alleged violations became public; (2) breached their fiduciary duty to maintain internal controls regarding Accretive's compliance with federal and state laws; (3) made untrue statements or omissions of material fact in connection with the purchase or sale of Accretive stock, in violation of federal securities law; and (4) breached federal securities law by receiving incentive compensation and fees while violating § 10(b) and Rule 10b-5. The parties agree that Delaware law applies to Counts I and II because Accretive is a Delaware corporation, *see Bagdon v. Bridgestone/Firestone, Inc.*, 916 F.2d 379, 382 (7th Cir. 1990) (corporate governance lawsuits are decided under the law of the corporation's state of incorporation), and that Counts III and IV are governed by federal law.

Defendants have moved to dismiss the complaint on the ground that Plaintiffs have not adequately pleaded demand futility under Rule 23.1(b) and, alternatively, that none of the complaint's four counts states a claim upon which relief can be granted. Because Plaintiffs have failed to adequately plead demand futility, there is no need to reach the alternative argument— although there is some substantive discussion of the federal securities claims in the section of the opinion addressing whether Plaintiffs have adequately alleged for demand futility purposes that a requisite number of Defendants are disinterested under Delaware law. Before addressing demand futility, it is necessary to reach Defendants' argument that certain paragraphs of the complaint should be stricken under Rule 12(f).

## I.  Defendants' Motion to Strike

Rule 12(f) provides in relevant part that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  Defendants contend that the court should strike the complaint's sixty or so paragraphs that supposedly "piggyback" off of the unproven allegations in the Minnesota Attorney General's complaint against and consent order with Accretive.  Doc. 97 at 20-23 & n.5 (listing the supposedly immaterial paragraphs); Doc. 120 at 38-40.  Defendants say: "Plaintiffs' Complaint relies heavily on allegations raised in a now-defunct complaint filed by the Minnesota Attorney General and a related Compliance Review.  None of these allegations are within the personal knowledge of Plaintiffs; rather, they are simply copied-and-pasted or paraphrased from the Attorney General's pleadings and press announcements."  Doc. 97 at 20-21.

As an initial matter, it is not at all clear that those allegations are not based on Plaintiffs' personal knowledge.  Although many of Plaintiffs' allegations overlap with those in the Minnesota Attorney General's complaint, Plaintiffs assert that their "allegations are based upon personal knowledge as to themselves and their own acts, and upon information and belief developed from the investigation and analysis of their counsel, which includes, among other things, the review of certain of [Accretive's] Board of Director minutes, Audit Committee minutes, Board packages and standard operational manuals garnered through a request for such information pursuant to 8 Del. C. § 220, materials received from the Minnesota Attorney General pursuant to the Data Practices Act (Minn. Stat. 13.01 *et seq*. 2012), public filings by Accretive with the [SEC], press releases, news reports, analyst reports, matters of public record available from various state and federal government websites, complaints pending against [Accretive] in state and federal courts, and other information available in the public domain."  Doc. 72 at pp. 1-

2.  Defendants do not explain how the court can conclude on the pleadings that Plaintiffs' allegations tracking the Minnesota Attorney General's allegations are not based on Plaintiffs' own knowledge derived from the other materials that Plaintiffs reviewed.  If Plaintiffs' factual allegations are true, as the court must assume at this stage, then it is hardly surprising that the Minnesota Attorney General and Plaintiffs reached the same conclusions about Accretive through their separate investigations.

Defendants submit that "as a matter of well-settled law, Plaintiffs may not rely on the Minnesota Attorney General's investigation or Accretive Health's settlement of the Minnesota Attorney General's lawsuit—which involved no admission of fault or liability by the Company—in support of their Complaint."  Doc. 97 at 21.  To support this submission, Defendants cite only a few federal district court opinions.  *Id*. at 21-22.  As the Seventh Circuit has "noted repeatedly, a district court decision does not have stare decisis effect [and] … is not a precedent," and that "[t]he fact of such a decision is not a reason for following it."  *Midlock v. Apple Vacations West, Inc.*, 406 F.3d 453, 457-58 (7th Cir. 2005).  One of the cases cited by Defendants speaks of "the well-established precedent [holding] that references to preliminary steps in litigations and administrative proceedings that did not result in an adjudication on the merits or legal or permissible findings of fact are, as a matter of law, immaterial under Rule 12(f)."  *In re Rough Rice Commodity Litig.*, 2012 WL 473091, at *4 (N.D. Ill. Feb. 9, 2012) (internal quotation marks omitted).  Although it described that rule as "well-established," *Rough Rice* also noted that no decision of the Seventh Circuit or of any other court of appeals other than the Second Circuit had spoken to the question "whether it is sufficient for a plaintiff to plead a manipulation violation by merely parroting a CFTC settlement, entered into without admitting or denying any of the allegations."  *Id*. at *5 (internal quotation marks omitted).

The Second Circuit decision is *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976). The plaintiff in that case included within the complaint "a series of references to SEC objections to various [of the defendant's] registration and proxy statements," and attached to the complaint an SEC complaint that had been filed against the defendant but that had been resolved by consent decree, with no admissions or findings of liability. *Id*. at 892. The defendant contended that those references should be stricken as immaterial under Rule 12(f) because neither the SEC complaint nor the consent decree could be introduced into evidence. *Id*. at 892-93. Both the Second Circuit and the plaintiff agreed that those documents were inadmissible as evidence. *Id*. at 893. The Second Circuit determined on that basis that the SEC complaint and consent decree were indeed immaterial under Rule 12(f). *See ibid*. (noting that "it is settled that the motion [under Rule 12(f)] will be denied, unless it can be shown that no evidence in support of the allegation would be admissible," but holding that "neither a complaint nor references to a complaint which results in a consent judgment may properly be cited in the pleadings under the facts of this case"). The court concluded: "The order of the district court [granting the motion to strike] is modified to the extent that plaintiff be permitted to amend his complaint to particularize the alleged inadequacies …, omitting any references to the complaint of the SEC against [the defendant]. Rule 12(f) should be construed strictly against striking portions of the pleadings on the grounds of immateriality, and if the motion is granted at all, the complaint should be pruned with care." *Id*. at 894.

This court understands *Lipsky* to stand for the proposition that an allegation as to what a complaint (or other document) filed in another litigation *says* is immaterial under Rule 12(f) where that complaint is inadmissible as evidence. This is a narrow proposition, in keeping with the Second Circuit's view that "Rule 12(f) should be construed strictly against striking portions

of the pleadings on the grounds of immateriality." *Ibid*. By contrast, where a plaintiff does not make allegations about the *content* of an inadmissible document but rather alleges independently sourced and appropriately supported facts that *track* ("piggyback on") that inadmissible document's factual allegations, the plaintiff's allegations are not immaterial under *Lipsky*'s interpretation of Rule 12(f) because the rationale of *Lipsky*—that an allegation is immaterial if it could not possibly be supported by admissible evidence—is inapplicable in that instance.

Under this reading of *Lipsky*, most or all of the allegations challenged by Defendants are perfectly acceptable under Rule 12(f). For instance, Defendants contend that ¶ 46 of the complaint is immaterial. Doc. 97 at 23 n.5. That paragraph states:

> Fairview and Accretive entered into two contracts defining their business relationship in 2010. On March 29, 2010, Fairview and Accretive entered into the "Revenue Cycle Operations Agreement" ("RCA"), under which Fairview delegated to Accretive the authority to manage all day-to-day aspects of the revenue cycle operations, going so far as to execute a power of attorney to fully empower Accretive to make billing decisions for the hospital as it related to Medicaid, Medicare, and third-party insurers. *See* Exhibit A at 4. According to Accretive's Form 10-K filed with the SEC on February 29, 2010, Accretive received approximately $100 million from Fairview in 2011 just from the RCA, which accounted for roughly 12% of Accretive's revenue in 2011.

Doc. 72 at ¶ 46. That allegation is not covered by the rule of *Lipsky* because it could be proved by evidence other than the inadmissible Minnesota Attorney General complaint and consent decree; most obviously, it could be proved by the RCA and the Form 10-K referenced in the allegation. Most of the challenged paragraphs are similarly undisturbed by *Lipsky*, though where the complaint does simply allege the contents of inadmissible documents, the court will disregard those allegations. To the extent that the nonprecedential district court opinions cited by Defendants go beyond *Lipsky* to reach allegations that simply allege the same facts alleged in the Minnesota Attorney General's complaint, this court declines to follow those cases.

**II.    Demand Futility**

Federal Rule of Civil Procedure 23.1(b), which establishes the pleading requirements for federal court derivative actions, provides that the complaint must "state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort."  Fed. R. Civ. P. 23.1(b)(3).  Plaintiffs concede that "[n]o demand was made on the Board," but contend that demand would have been futile and therefore was not required under Rule 23.1(b)(3)(B).  Doc. 72 at ¶ 276.  "[F]ederal law governs the degree of detail that the plaintiff must furnish when it gives its 'reasons for not obtaining the action or not making the effort.'"  *Westmoreland Cnty. Emp. Ret. Sys.*, 2013 WL 4266586, at *1 (quoting Fed. R. Civ. P. 23.1(b)(3)(B)).  Delaware substantive law governs whether the complaint's demand futility allegations are sufficient to plead demand futility.  *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 96-98, 108-09 (1991) (noting that the demand requirement is substantive and thus is governed by state law with respect to state law causes of action, and holding that federal common law incorporates state demand futility law with respect to federal causes of action); *Westmoreland Cnty. Emp. Ret. Sys.*, 2013 WL 4266586, at *4; *Abbott Labs.*, 325 F.3d at 804.

There are two distinct demand futility tests under Delaware law, one arising from *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), and the second from *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993).  *See Wood*, 953 A.2d at 140 (describing both tests).  Defendants argue that the *Rales* test applies, Doc. 97 at 25; Doc. 120 at 13-14, while Plaintiffs maintain that "the Court must apply the *Aronson* test because Plaintiffs allege that a majority of Accretive's Board had actual knowledge of illegal wrongdoing, yet consciously decided not to take any steps

to prevent or remedy the situation," Doc. 108 at 32. By pressing *Aronson* as opposed to *Rales*, Plaintiffs have forfeited and likely waived any argument that their allegations satisfy *Rales*.

"The *Aronson* test applies to claims involving a contested transaction *i.e.*, where it is alleged that the directors made a conscious business decision in breach of their fiduciary duties. That test requires that the plaintiff allege particularized facts creating a reason to doubt that (1) the directors are disinterested and independent or that (2) the challenged transaction was otherwise the product of a valid exercise of business judgment." *Wood*, 953 A.2d at 140 (footnotes, brackets, and internal quotation marks omitted). "The test is 'in the disjunctive[:] if either prong is satisfied, demand is excused.'" *Westmoreland Cnty. Emp. Ret. Sys.*, 2013 WL 4266586, at *4 (Seventh Circuit's alteration) (quoting *Brehm v. Eisner*, 746 A.2d 244, 256 (Del. 2000)). The court will consider both prongs in turn.

## A. Disinterestedness and Independence

Demand futility is sufficiently alleged where there is reason to doubt that at least half of the directors lack disinterestedness or independence. *See Beneville v. York*, 769 A.2d 80, 85-86 (Del. Ch. 2000) (demand is excused where at least half of the directors on a board with an even number of directors are interested or non-independent). The board in this case consists of eight directors, so Plaintiffs must adequately allege that four are either interested or non-independent. The court assumes that Tolan, as President and CEO of Accretive, lacks independence, and so Plaintiffs must allege facts giving rise to a reason to doubt that three of the other seven directors were interested or non-independent. *See In re Goldman Sachs Grp., Inc. S'holder Litig.*, 2011 WL 4826104, at *7 (Del. Ch. Oct. 12, 2011) ("It can be assumed that Blankfein and Cohn, as officials of Goldman, would be found to be interested or lack independence.").

1.          **Disinterestedness**

Plaintiffs argue that at least three directors other than Tolan lack disinterestedness for either of two reasons.  The first is that at least three directors face a substantial likelihood of personal liability for their connection to the wrongdoing alleged in this lawsuit, and the second is that at least three directors received illicit personal financial gains from the alleged wrongdoing.

To show lack of disinterestedness on the ground that directors face a substantial likelihood of personal liability, a plaintiff must do more than merely name the directors as defendants and plead a claim against them that is sufficient to survive dismissal under Rule 12(b)(6).  As *Aronson* explains, "the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors, although in rare cases a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists."  473 A.2d at 815.  In other words, the possibility that a director may be found personally liable usually is insufficient; rather, it renders him non-disinterested only where the challenged transaction is so egregious as to fall outside the protection of the business judgment rule.  Plaintiffs have failed to establish that demand is excused due to a substantial likelihood of personal liability because they have not alleged that directors other than Tolan were responsible for a decision "so egregious on its face" that the business judgment rule could not apply.

The business judgment rule is "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."  *Gantler v. Stephens*, 965 A.2d 695, 705-06 (Del. 2009) (quoting *Aronson*, 473 A.2d at 812).  It is axiomatic that "a court will not

substitute its judgment for that of the board if the … decision can be attributed to any rational business purpose." *Id*. at 706 (quoting *Unocal v. Mesa Petroleum Co.*, 493 A.2d 946, 954 (Del. 1985)) (internal quotation marks omitted). Plaintiffs contend that Defendants are not entitled to business judgment rule protection because they consciously decided to allow Accretive to break the law. Doc. 108 at 38-39, 45-48.

"The business judgment rule normally protects all lawful actions of a board of directors, provided they were taken in good faith." *Kahn ex rel. DeKalb Genetics Corp. v. Roberts*, 679 A.2d 460, 465 (Del. 1996). The presumption is rebutted by a showing of bad faith, which "may be shown where 'the fiduciary … acts with the intent to violate applicable positive law.'" *Ryan v. Gifford*, 918 A.2d 341, 357 (Del. Ch. 2007) (quoting *Stone*, 911 A.2d at 369). There are other scenarios in which the business judgment rule is inapplicable, but this is the only one Plaintiffs have argued. Doc. 108 at 38-39 ("Corporate directors cannot act beyond their lawful powers, and their conscious decision to allow illegal conduct is not a valid exercise of business judgment. … [T]he Individual Defendants knowingly permitted Accretive to systematically violate numerous debt collection and patient privacy laws in its quest to maximize short-term profits at the expense of the long-term value of the Company."). It follows that Plaintiffs have forfeited, at least for purposes of this motion to dismiss, any other scenarios that might apply. *See Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999) ("Our system of justice is adversarial, and our judges are busy people. If they are given plausible reasons for dismissing a complaint, they are not going to do the plaintiff's research and try to discover whether there might be something to say against the defendants' reasoning.").

The question, then, is whether Plaintiffs have adequately alleged that three directors other than Tolan acted with the intent to violate the law or that they knew Accretive was violating the

law and did nothing about it. As discussed more specifically in the Background section above, Plaintiffs have failed to adequately allege that Defendants other than Tolan had knowledge of Accretive's unlawful activities. *See Desimone*, 924 A.2d at 940 ("Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, … the board must have known so."). It necessarily follows that Plaintiffs have failed to allege that those Defendants intentionally broke the law, intentionally caused Accretive to do so, or knowingly permitted Accretive to do so. *See In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 654-55 (Del. Ch. 2008) (noting that "a very extreme set of facts would seem to be required to sustain a disloyalty claim premised on the notion that disinterested directors were intentionally disregarding their duties," and rejecting the plaintiffs' liability theory as "untenable" because they failed to plead facts suggesting knowledge that their actions would injure the company or its stockholders); *Stanley v. Arnold*, 2012 WL 5269147, at *8 (S.D. Ohio Oct. 23, 2013) (explaining that "[a] plaintiff must plead with specificity which documents, which conversations, which employees, or which reports show the supposed failure and the necessary intent to harm or reckless disregard, so as to substantiate the accusations of demand futility," and concluding that the complaint failed to adequately allege demand futility because "there are no allegations of reports to the Board or any evidence of the Board's knowledge of any purported failure to comply with the [agreement]") (internal quotation marks omitted); *Strong ex rel. Tidewater, Inc. v. Taylor*, 877 F. Supp. 2d 433, 445 (E.D. La. 2012) ("[w]hat is glaringly missing from Plaintiff's Complaint are any allegations that any one of the Individual Defendants *knowingly* made a deceptive or incomplete communication") (emphasis added).

The circumstances presented in *Abbott Labs.*, where the Seventh Circuit held that the plaintiffs had adequately alleged board action "so egregious on its face that board approval

cannot meet the test of business judgment," *Aronson*, 473 A.2d at 815, are materially different

than those presented here.  In *Abbott Labs.*,

> The chairman of the board received copies of the two Warning Letters in
> 1994 and another in early 1999.  Although the district court described the
> language in the Warning Letters as "boilerplate" and stated that the plaintiffs
> "ascribe much greater importance to the warning letters than they probably
> deserve," continuing violations of federal regulations over a period of six
> years cannot be minimized. …
>
> The FDA met at least ten times with Abbott representatives, including
> White and other senior officers, concerning the continuing violations. The
> WALL STREET JOURNAL published information about Abbott's FDA
> problems in 1995.  By 1999, even a third-party analyst questioned why Abbott
> continued to "drag [ ] their feet fixing the [FDA] problems." Although Abbott
> sought to negate the effects of this news in its press release of 1999, the
> release itself substantiates the fact that the company, and, correspondingly, the
> board of directors, knew of the problems and were aware that the FDA had
> threatened to file an injunction against Abbott.
>
> \*   \*   \*
>
> … We find that six years of noncompliance, inspections, 483s, Warning
> Letters, and notice in the press, all of which then resulted in the largest civil
> fine ever imposed by the FDA and the destruction and suspension of products
> which accounted for approximately $250 million in corporate assets, indicate
> that the directors' decision to not act was not made in good faith and was
> contrary to the best interests of the company.

325 F.3d at 808-09 (alterations in the original) (internal citations omitted).

The allegations of director knowledge in this case do not even remotely compare to those

in *Abbott Labs.*; there were no questions by third-party analysts, no regulatory inspections or

inquiries into Accretive's conduct, and no regulatory warning letters issued to Accretive, and

while there was an article about Accretive in the press, it appeared after the time period during

which most if not all of Defendants' misfeasance is alleged to have occurred.  Although the facts

in *Abbott Labs.* certainly do not set a floor for purposes of what must be pleaded to allege that

director defendants violated the business judgment rule, the allegations here fall well short of the

line.  *See In re Capital One Derivative S'holder Litig.*, 2013 WL 3242685, at *13 n.18

(distinguishing *Abbott Labs.* on similar grounds); *In re SAIC Derivative Litig.*, 2013 WL

2466796, at *19-22 (same); *Gulbrandsen ex rel. Wells Fargo & Co. v. Stumpf*, 2013 WL

1942158, at *5 (N.D. Cal. May 9, 2013) (same); *In re Abbott Depakote S'holder Derivative

Litig.*, 909 F. Supp. 2d 984, 998 (N.D. Ill. 2012) (same); *Garza ex rel. Navistar Int'l Corp. v.

Belton*, 2010 WL 3324881, at *8-9 (N.D. Ill. Aug. 13, 2010) (same).

     The Seventh Circuit's recent decision in *Westmoreland County Employee Retirement

System* is distinguishable for much the same reason.  The plaintiffs in that case alleged that the

directors of Baxter International, Inc., consciously disregarded their responsibility to bring

Baxter into compliance with a 2006 consent decree with the federal Food and Drug

Administration ("FDA") that required the company to take remedial steps regarding a particular

product, which caused Baxter to lose more than $500 million after an FDA-mandated recall of

that product in 2010.  *Westmoreland Cnty. Emp. Ret. Sys.*, 2013 WL 4266586, at *1.  The

plaintiffs alleged that the Baxter directors were aware of the 2006 consent decree, the company's

efforts to comply with the decree, and the FDA's severe dissatisfaction with those efforts, and

yet failed to ensure that the company complied with the decree to the FDA's satisfaction;

ultimately, the FDA had enough with Baxter's languishing efforts and ordered the recall.  *Id.* at

*2-3.  Specifically, the plaintiffs alleged: "Despite repeated warnings from the FDA that Baxter's

remedial efforts were insufficient—warnings that were directly communicated to CEO Parkinson

*and passed along to the board of directors*—the board took no action to ensure the company's

timely compliance with the law, choosing instead to work on the new [product] despite its legal

obligations regarding the old [product, which had been subject to the 2006 consent decree]."  *Id.*

at *6 (emphasis added). Here, by contrast, as set forth in detail above, Plaintiffs' allegations do not permit a reasonable inference that Defendants had anywhere near that degree of knowledge.

An allegation that at least three Defendants other than Tolan violated federal securities law by causing Accretive to make false public statements that inflated its stock price might excuse demand by threatening those Defendants with personal liability. *See In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1057 (C.D. Cal. 2008) (noting the substantial overlap between the standard for stating a claim under § 10(b) of the Securities Exchange Act and the standard for excusing demand, and finding a strong inference of scienter based on plaintiffs' allegations "that the Individual Defendants misled the public with regard to the rigor of Countrywide's loan origination process, the quality of its loans, and the Company's financial situation"); *id.* at 1082 (adding that "[f]or the same reasons that it found a strong inference of scienter, the Court finds that the Complaint pleads evidence of a 'sustained or systematic failure of the board to exercise oversight,' so as to create a substantial likelihood of liability for [Individual Defendants]"). Plaintiffs, however, have failed to adequately allege securities law violations by Defendants other than Tolan. "The elements of a section 10(b) Securities Exchange Act claim are: (1) a material misrepresentation or omission by the defendant in connection with the purchase or sale of securities; (2) scienter; (3) reliance; (4) economic loss; and (5) loss causation." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 617 (7th Cir. 2011). "Scienter" in this context "means 'knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false.'" *Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008) (quoting *Higginbotham v. Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007)). Heightened pleading standards apply to Plaintiffs' federal securities law claims due to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which requires Plaintiffs to "state with

particularity facts giving rise to a strong inference that the defendant acted with the required state

of mind." 15 U.S.C. § 78u-4(b)(2). The Supreme Court explained what is meant by "strong

inference" in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007):

> It does not suffice that a reasonable factfinder plausibly could infer from the
> complaint's allegations the requisite state of mind. Rather, to determine
> whether a complaint's scienter allegations can survive threshold inspection for
> sufficiency, a court governed by [§ 78u-4(b)(2)] must engage in a comparative
> evaluation; it must consider, not only inferences urged by the plaintiff … but
> also competing inferences rationally drawn from the facts alleged. An
> inference of fraudulent intent may be plausible, yet less cogent than other,
> nonculpable explanations for the defendant's conduct. To qualify as "strong"
> within the intendment of [§ 78u-4(b)(2)], we hold, an inference of scienter
> must be more than merely plausible or reasonable—it must be cogent and *at
> least as compelling as any opposing inference of nonfraudulent intent.*

*Id.* at 314 (emphasis added).

As described in the Background section, Plaintiffs' allegations are not *inconsistent* with

the possibility that Defendants (other than Tolan) knew the facts that, according to Plaintiffs,

made Accretive's public statements false. But the far more compelling inference on the

pleadings is that those directors were not aware of Accretive's various legal violations and so did

not act with scienter in causing Accretive to make optimistic public statements about its

relationship with Fairview. Thus, Plaintiffs have not adequately alleged that any Defendant

other than Tolan made or caused Accretive to make statements with knowledge that those

statements were false or that there was a substantial risk that they were false. *See Winters v.

Stemberg*, 529 F. Supp. 2d 237, 251 (D. Mass. 2008) (holding that the plaintiffs insufficiently

alleged scienter based on their claim that the defendants filed proxy statements inflating the

financial health of the company and hiding the alleged fact that backdating occurred, reasoning

that the plaintiffs "allege only eleven of *fifty-one* stock option grants occurred at suspicious

times, and this Court can readily imagine plausible, nonculpable explanations for the post-grant

rise in stock price with regard to this small subset"); *In re Verisign, Inc., Derivative Litig.*, 531 F. Supp. 2d 1173, 1206 (N.D. Cal. 2007) (rejecting the plaintiffs' allegation that company directors acted with scienter by holding and exchanging company stock in the midst of a backdating scheme that inflated stock prices, reasoning that the plaintiffs "fail[] to allege, with respect to each defendant, facts giving rise to a strong inference that each such defendant acted with deliberate recklessness or engaged in conscious misconduct," and dismissing "as generalities" the facts pled—"that dozens of options were backdated, that such alleged backdating violated the applicable option plans, that the alleged backdating occurred on multiple occasions, and that the VeriSign stock price rose after the alleged grants"). And absent that predicate, Plaintiffs have not adequately alleged that any Defendant other than Tolan is sufficiently threatened with personal liability for purposes of establishing demand futility.

Plaintiffs' second reason for finding that several defendants (Cline, Bronfman, Nayden, Wolfson, and Tolan) lack disinterestedness is that they gained financially from Accretive's illegal behavior "by taking advantage of a lucrative secondary stock offering at a time when the Company's stock was artificially inflated." Doc. 108 at 48. Plaintiffs say that Accretive's stock price was artificially inflated by Defendants' positive public statements about Accretive's business prospects and by their failure to disclose facts—Accretive's violations of the FDCPA, patient privacy laws, and so forth—that would have cast doubt on those positive statements and led the market to decrease its valuation of Accretive. Plaintiffs conclude that "[b]ecause defendants Cline, Bronfman, Nayden, Wolfson, and Tolan received millions of dollars in personal financial benefit that was not shared by either the stockholders or the Company, those directors cannot be considered disinterested." *Id*. at 49.

The trouble with this theory is that a director does not become interested for demand futility purposes merely because he has sold shares of the company's stock. As the case cited by Plaintiffs explains, "the mere fact that stocks were traded by an officer or director does not establish a breach of the duty of loyalty. A director is free to trade in the corporation's stock without liability to the corporation. In fact, when directors and officers own stock or receive compensation in stock, they should be expected to trade those securities in the normal course of events." *McCall v. Scott*, 239 F.3d 808, 825 (6th Cir. 2001) (citations omitted); *see also Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 833 A.2d 961, 974 (Del. Ch. 2003) (holding that directors' sales of stock in the company did not "place[] them in a position inimical to their duties to the Company," and remarking that "[w]ere [the court] to decide otherwise, directors of every Delaware corporation would be faced with the ever-present specter of suit for breach of their duty of loyalty if they sold stock in the company on whose Board they sit"), *aff'd*, 845 A.2d 1040 (Del. 2004); *Guttman v. Huang*, 823 A.2d 492, 502 (Del. Ch. 2003) ("Although insider sales are (rightly) policed by powerful forces—including the criminal laws—to prevent insiders from unfairly defrauding outsiders by trading on non-public information, it is unwise to formulate a common law rule that makes a director 'interested' whenever a derivative plaintiff cursorily alleges that he made sales of company stock in the market at a time when he possessed material, non-public information."); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1424 (3d Cir. 1997) ("We will not infer fraudulent intent from the mere fact that some officers sold stock."). Thus, that Defendants made a lot of money from selling Accretive stock does not excuse Plaintiffs from meeting the demand requirement.

## 2. Independence

Plaintiffs contend that "five Defendants—Spiegel, Bronfman, Cline, Nayden, and Wolfson—lack independence because they have longstanding personal and lucrative financial relationships with their intertwined private equity firms and each other, and as such, these countervailing strong loyalties render these men incapable of making a decision with only the best interests of the corporation in mind." Doc. 108 at 42. "In making the required judgment [as to whether a director is independent,] no single factor—such as receipt of directorial compensation; family or social relationships; approval of the transaction attacked; or other relationships with the corporation (*e.g.*, attorney or banker)—may itself be dispositive in any particular case. Rather, the question is whether the accumulation of all factors creates the reasonable doubt [that the directors are independent] to which *Aronson* refers." *Harris v. Carter*, 582 A.2d 222, 229 (Del. Ch. 1990). Plaintiffs say that the following facts show that those five Defendants lack independence. Doc. 108 at 43-44.

First, Plaintiffs allege that Nayden, Wolfson, Cline, and Bronfman are partners at the two firms that founded Accretive—Oak Hill and Accretive LLC—and that those firms continue to own interests in Accretive. Specifically, Nayden and Wolfson are managing partners at Oak Hill, which Wolfson founded, while Cline and Bronfman are partners at Accretive LLC, which Cline founded. Oak Hill owns 8.2% of Accretive's common stock, and Accretive LLC retains an unspecified interest in Accretive. Plaintiffs suggest that Bronfman owes his position at Accretive LLC to Cline (who founded that firm), making Bronfman dependent on Cline. Second, Plaintiffs allege that Nayden, Wolfson, Cline, Bronfman, and Spiegel each own substantial shares in Accretive (ranging from 1.4% to 8.2% of its stock); Nayden, Bronfman, and Spiegel personally profited by selling Accretive stock in Accretive's two public offerings (with profits ranging from

41

$6.6 million to $45.9 million); and each of these five receives a salary from Accretive for serving as a director (ranging from $155,000 to $175,000 in 2011).  Third, Plaintiffs allege that Cline serves on the boards of other firms along with other various other Accretive directors: He serves on the board of Arise Virtual Solutions (which is owned by Accretive LLC) with Tolan; on the board of Accolade, Inc., with Spiegel; and on the boards of Fandango and AlphaStaff (both also owned by Accretive LLC) with Bronfman.

These allegations do not raise a reasonable doubt as to the independence of any director other than Tolan.  The outside director Defendants are not rendered non-independent by their affiliations with Oak Hill and Accretive LLC, even though those affiliations presumably are the reason why they were made directors.  As *Aronson* explained: "[I]t is not enough to charge that a director was nominated by or elected at the behest of those controlling the outcome of a corporate election.  That is the usual way a person becomes a corporate director.  It is the care, attention and sense of individual responsibility to the performance of one's duties, not the method of election, that generally touches on independence."  *Aronson*, 473 A.2d at 816. Fundamentally, the allegations regarding Defendants' affiliations with Oak Hill and Accretive LLC simply mean that they have substantial control over Accretive through the firms that they control, which for practical purposes is indistinguishable from their personally owning large stakes in Accretive.  *See In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 808, 822 (Del. Ch. 2005) (holding that the complaint failed to adequately allege that Bechtel, a JPMorgan director, was not independent based on the fact that he was the CEO and director of another company that did lucrative business with a bank managed by JPMorgan, and the fact that his company was engaged in an investment partnership with JPMorgan and its affiliates, reasoning that "[a]lthough Bechtel's company has received over $2 billion from [a bank managed by

JPMorgan] …, the plaintiffs do not allege that the money was somehow connected to Bechtel's relationship with [JPMorgan] or that future [funding for Bechtel's company] would be jeopardized if Bechtel voted against [JPMorgan's CEO]").  And it is not clear what relevance Defendants' ownership of Accretive stock could have to the independence analysis.  Indeed, "it has been thought that having directors who actually owned a meaningful, long-term common stock stake was a useful thing, because that would align the interests of the independent directors with the common stockholders and give them a personal incentive to fulfill their duties effectively."  *LC Capital Master Fund, Ltd. v. James*, 990 A.2d 435, 452 (Del. Ch. 2010).

Nor is Defendants' independence affected by the fact that they sold some of their stock and made a great deal of money from doing so.  As noted above, "when directors and officers own stock or receive compensation in stock, they should be expected to trade those securities in the normal course of events."  *McCall*, 239 F.3d at 825.  Plaintiffs focus heavily on Defendants' wealth, but they do not explain how Defendants' ownership and sale of Accretive stock could make them non-independent.  They certainly do not suggest that Defendants other than Tolan are beholden to Tolan for their money.

As for the fact that Accretive pays its directors rather than expecting them to work for free, "the mere fact that a director receives compensation for her service as a board member adds little or nothing to demand-futility analysis, without more—*i.e.*, unless the pleadings demonstrate, for example, that the status or compensation was somehow 'material' to the director or otherwise outside the norm."  *Khanna v. McMinn*, 2006 WL 1388744, at *16 (Del. Ch. May 9, 2006) (footnote and internal quotation marks omitted).  If a CEO somehow had effective power to terminate the director, then the fact that the director's compensation for being a director was a substantial part of the director's total income might render him dependent on the

CEO and thereby undermine his independence. But there is no allegation that Tolan had that power here, and no allegation that Defendants' compensation for serving as Accretive directors were material in comparison to their total income. *See MCG Capital Corp. v. Maginn*, 2010 WL 1782271, at *20 (Del. Ch. May 5, 2010) ("For director compensation to create independence problems, however, it must be shown that the compensation is material to the director."); *Selectica, Inc. v. Versata Enters., Inc.*, 2010 WL 703062, at *14 (Del. Ch. Feb. 26, 2010) (same). And Plaintiffs provide no basis to conclude that director compensation of $155,000 to $175,000 per year is "outside the norm" for corporations of Accretive's scale.

The two cases cited by Plaintiffs to support their argument that Defendants' director compensation is material, Doc. 108 at 42 n.14, are irrelevant because they discuss not compensation paid by the corporation to its directors for their services as directors, but money paid to the directors by other interested parties for other work. *See Kahn v. Portnoy*, 2008 WL 5197164, at *8-9 (Del. Ch. Dec. 11, 2008) (holding that the directors were not independent of the CEO where they held paid positions with other entities controlled by the CEO); *In re The Limited, Inc. S'holders Litig.*, 2002 WL 537692, at *6 (Del. Ch. Mar. 27, 2002) (holding that the director was not independent of the firm's CEO where he was paid $150,000 annually to serve a consultant to the firm and where the CEO controlled who the firm hires as a consultant). There is no suggestion that Tolan effectively controlled who would serve on Accretive's board or that any of the other directors held other paid positions from which Tolan could fire them.

Nor are Defendants rendered non-independent by their personal relationships. The Delaware Supreme Court has held that reasonable doubt as to a director's independence could "arise either because of financial ties, familial affinity, a particularly close or intimate personal or business affinity or because of evidence that in the past the relationship caused the director to act

non-independently vis à vis an interested director." *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1051 (Del. 2004). That said, the Delaware Supreme Court held in the same decision: "[S]ome professional or personal friendships, which may border on or even exceed familial loyalty and closeness, may raise a reasonable doubt whether a director can appropriately consider demand. This is particularly true when the allegations raise serious questions of either civil or criminal liability of such a close friend. Not all friendships, or even most of them, rise to this level and the Court cannot make a *reasonable* inference that a particular friendship does so without specific factual allegations to support such a conclusion." *Id*. at 1050 (quoting *Beam*, 833 A.2d at 979).

Applying that standard, the Delaware Supreme Court held that the following allegations were insufficient to create such a doubt that a firm's other directors were dependent on Martha Stewart, who controlled the firm in question:

> Allegations that Stewart and the other directors moved in the same social circles, attended the same weddings, developed business relationships before joining the board, and described each other as "friends," even when coupled with Stewart's 94% voting power, are insufficient, without more, to rebut the presumption of independence. They do not provide a sufficient basis from which reasonably to infer that Martinez, Moore and Seligman may have been beholden to Stewart. Whether they arise before board membership or later as a result of collegial relationships among the board of directors, such affinities—standing alone—will not render presuit demand futile.

*Id*. at 1051. The alleged relationships in *Beam* were much stronger than the relationships alleged here among Defendants. It follows that these alleged relationships do not cast a reasonable doubt on Defendants' independence. *See Khanna*, 2006 WL 1388744, at *16 (explaining that "[t]he Court's analysis in *Beam* was primarily directed at social relationships, but it also may inform the evaluation of allegations of business relationships," as "the heightened strength of relationship required to find that a director's 'discretion would be sterilized' renders allegations

concerning most ordinary relationships of limited value, at most"); *Orman v. Cullman*, 794 A.2d 5, 27-28 (Del. Ch. 2002) (holding that "[t]he naked assertion of a previous business relationship is not enough to overcome the presumption of a director's independence," and finding that the plaintiffs failed to challenge the independence of certain directors who had "longstanding business relations" with other board members); *Freuler v. Parker*, 803 F. Supp. 2d 630, 646 n.24 (S.D. Tex. 2011) (noting that "Delaware courts have made clear that a plaintiff showing that demand would be futile must do more tha[n] conclusorily assert entangling alliances").

As required by Delaware law, the court has considered Plaintiffs' arguments regarding independence both separately and together. *See Harris*, 582 A.2d at 229 ("the question is whether the accumulation of all factors creates the reasonable doubt [that the directors are independent] to which *Aronson* refers"). Having reviewed the allegations, the court concludes that they are insufficient to raise a reasonable doubt as to the independence of Defendants other than Tolan.

### B.    Business Judgment Rule

Where, as here, "the underlying transaction was approved by a disinterested and independent board majority, then the court moves to the second inquiry: whether the plaintiff 'has alleged facts with particularity which, if taken as true, support a reasonable doubt that the challenged transaction was the product of a valid exercise of business judgment.'" *In re China Agritech, Inc. S'holder Derivative Litig.*, 2013 WL 2181514, at *15 (Del. Ch. May 21, 2013) (quoting *Aronson*, 473 A.2d at 815). Under this second prong of the *Aronson* test, "demand may be excused if 'in rare cases a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, [resulting in] a substantial likelihood of director

liability.'" *Abbott Labs.*, 325 F.3d at 808 (quoting *Brehm*, 746 A.2d at 259) (Seventh Circuit's alterations).

   As noted above, Plaintiffs' position that Defendants are not entitled to the protections of the business judgment rule rests on the premise that Defendants knew of Accretive's misconduct and deliberately chose to take no action in response. Doc. 108 at 38-39. Under these circumstances, analysis under *Aronson*'s second prong overlaps entirely with the discussion of the business judgment rule in the "substantial likelihood of personal liability" portion of the disinterestedness inquiry in Section II.A.1, *supra*. *See Aronson*, 473 A.2d at 815 ("the mere threat of personal liability for approving a questioned transaction, standing alone, is insufficient to challenge either the independence or disinterestedness of directors, although in rare cases a transaction may be so egregious on its face that board approval cannot meet the test of business judgment, and a substantial likelihood of director liability therefore exists"); *In re INFOUSA, Inc. S'holders Litig.*, 953 A.2d 963, 972, 995 (Del. Ch. 2007) (holding that certain directors faced a significant likelihood of personal liability based on their willingness to issue Form 10-Ks that contained material misrepresentations of the benefits provided to one director, and noting that "[i]n many cases, the relevant analysis [to resolve plaintiffs' allegations challenging the business judgment of the board] will include a showing by the plaintiffs that directors were either interested in the transaction or dominated by [a certain director]"); *In re SAIC Derivative Litig.*, 2013 WL 2466796, at *13 ("the particularized allegations essential to creating reasonable doubt as to a substantial likelihood of personal liability for breach of fiduciary duties may also implicate the question whether the Board can avail itself of business judgment protections"). Indeed, Plaintiffs' argument that there is a reasonable doubt as to Defendants' disinterestedness under the first *Aronson* prong is materially identical to their argument under the second *Aronson*

prong. Doc. 108 at 36-39, 45-48; *see In re Am. Int'l Grp., Inc. Derivative Litig.*, 700 F. Supp. 2d

419, 431 (S.D.N.Y. 2010) ("Plaintiffs frequently argue that there is reason to doubt that a

majority of directors are disinterested because the complaint alleges director conduct so

egregious on its face that board approval cannot meet the test of business judgment, and a

substantial likelihood of director liability therefore exists.") (internal quotation marks omitted).

Accordingly, as to the second prong of the *Aronson* test, Plaintiffs' contention that Defendants'

actions do not enjoy the protection of the business judgment rule is rejected for the reasons given

in Section II.A.1, *supra*.

## Conclusion

Plaintiffs' complaint is dismissed because it does not adequately plead demand futility.

As Plaintiffs request, Doc. 108 at 62 n.25, the dismissal is without prejudice and with leave to

replead. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when

justice so requires."); *Bogie v. Rosenberg*, 705 F.3d 603, 608 (7th Cir. 2013) ("When a complaint

fails to state a claim for relief, the plaintiff should ordinarily be given an opportunity, at least

upon request, to amend the complaint to correct the problem if possible."); *Foster v. DeLuca*,

545 F.3d 582, 584 (7th Cir. 2008) ("District courts routinely do not terminate a case at the same

time that they grant a defendant's motion to dismiss; rather, they generally dismiss the plaintiff's

complaint without prejudice and give the plaintiff at least one opportunity to amend her

complaint."). Plaintiffs have until October 22, 2013, to file an amended consolidated complaint;

Defendants will have until November 19, 2013, to answer or otherwise plead.

September 24, 2013

_____

United States District Judge